UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

CARLA UNDERWOOD,

               Plaintiff,                          Case Number 18-00017

v.                                          Honorable David M. Lawson

DYNAMIC SECURITY, INC.,

               Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION TO STRIKE JURY DEMAND

After the defendant fired plaintiff Carla Underwood from her job as a security officer, she brought this lawsuit for sexual discrimination and retaliation. The second amended complaint, which is the current operative pleading, states claims for hostile work environment and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401, *et seq.* In response to the defendant's pending motion for summary judgment, the plaintiff has abandoned her hostile work environment claim, which will be dismissed. Fact issues preclude summary judgment on the remaining retaliation claim. The defendant also moves to strike the jury demand, arguing that the plaintiff waived her right to a jury trial in the employment documents she signed. Underwood argues that the waiver was not knowingly made, but the factors the Court must consider when making that determination favor enforcing the waiver. The summary judgment motion will be granted in part, and the motion to strike the jury demand will be granted. The case will proceed to trial before the Court without a jury on the harassment claim.

## I. Facts and Proceedings

Carla Underwood was employed by Dynamic Security Inc. as a contract security guard. She was assigned to duties at the campuses of Pellissippi State Community College (PSCC). She alleges that she was sexually harassed by her supervisor at one of the campuses, J.T. Gibson. She had difficulty lodging a complaint about Gibson's conduct but eventually made her grievance known to the corporate human resource director. When it came time to reassign Underwood to another location, as the campus where she worked would close for the summer, she could not agree with Dynamic on a reassignment site. Dynamic terminated her employment. It says that the termination was due to Underwood's refusal to accept a new work assignment. Underwood says that her immediate supervisor was upset with her complaint to corporate headquarters, and that prompted the termination.

Dynamic hired Underwood as a security officer in January 2016. Dynamic initially assigned Underwood to PSCC's Hardin Valley Road campus in Knoxville, Tennessee. On February 22, 2016, Dynamic transferred her to PSCC's smaller campus in Blount County. When the Blount County campus closed during the summer of 2016, Underwood was reassigned to the Hardin Valley campus until the Blount County campus reopened in the fall.

Pamela Pauley became the district manager in Dynamic's Knoxville office on October 1, 2016. She was Underwood's direct supervisor throughout her employment. Pauley reported to Dynamic's regional manager, Ian Conroy, from September 2016 forward.

Dynamic's organizational structure also included the position of site supervisor, who generally was responsible for scheduling shifts. The site supervisor had no authority to hire, discipline, suspend, transfer, or fire security officers.

On July 27, 2016, while inside the security office at the Hardin Valley campus, Angela Garrett, Underwood's site supervisor and roommate at the time, approached Underwood from behind, patted her on the shoulder, moved around front and began striking Underwood on her arms, ribs, and breasts, groping them. Underwood, who identifies as a lesbian, pushed Garrett away; the exchange lasted "a few minutes." PSCC security officers were present during the altercation, investigated the incident, and reported it to Dynamic.

Ian Conroy, who was a district manager for Dynamic at the time, issued Underwood a disciplinary report the next day for fighting with another employee and involving the client (PSCC) rather than reporting the incident directly to Dynamic. Conroy also issued Garret a disciplinary report for fighting and reassigned her to another post at PSCC's request. Underwood and Garrett never worked together again.

Underwood alleges that Dynamic site supervisor J.T. Gibson sexually harassed her for several months. In January 2016 — before Underwood was assigned to the Blount County campus — J.T. Gibson, who was a fellow security officer at the time, tried to grab Underwood between her legs while they were in a patrol car. Underwood did not welcome Gibson's advance; she demanded that he stop the car and she got out.

Underwood transferred to the Blount County campus in February 2016. Gibson was promoted to Underwood's site supervisor around June 2016, but he worked at the Hardin Valley campus. Despite the previous assault, Underwood testified that she got along with Gibson for several months until he began sexually harassing her again in August 2016. Underwood testified that when she called the Hardin Valley campus from Blount County to clock in, she spoke with Gibson two or three times, during which he asked for sexual favors during work hours. He

propositioned her for sexual intercourse and oral sex. Gibson also sent Underwood the following

text messages throughout her employment:

> **September 26, 2016:** Gibson requested that Underwood send him what she thought must be inappropriate pictures that she did not plan on sending. *See* Underwood dep., ECF No. 61-1, PageID.305; *see also* Gibson Text Messages dated September 26, 2016, ECF No. 61-1, PageID.413-14 ("Ok try to send them to my phone my wifi is messed up . . . you send me lol . . . hey you turd . . . send me those to that number i [sic] texted you from"). She ignored Gibson, told him to stop, and "[f]or a short period of time, he would stop." *Id.* at PageID.306-07.

> **October 3 and 5, 2016:** Gibson texts Underwood, "Let me eat it lol," which Underwood interprets as a reference to oral sex. Gibson Text Messages dated sometime before October 3, 2016, ECF No. 61-1, PageID.419; Underwood Dep., ECF No. 61-1, PageID.313. He also texted, "I watched 50 shades of gray yesterday after work." Gibson Text Messages dated October 5, 2016, ECF No. 61-1, PageID.419.

> **Sometime after February 2017 (Date Redacted):** Gibson texts Underwood, "Can I come over when I get off at 1030 please." Gibson Text Messages, date redacted, ECF No. 61-1, PageID.417. Underwood responds, "Make them pay me," in reference to a vacation pay dispute she was having with Dynamic at the time. *Ibid.*; Underwood Dep., ECF No. 61-1, PageID.310. Gibson responds, "Can I come by tonight please I have been so good and waiting so long . . . please . . . please." *Ibid.*

> **Around May 18, 2017 (Exact Date Unclear):** Gibson and Underwood have the following exchange:
> Gibson: you ever going to new me haha
> Underwood: New you ??
> Gibson: Meet lol
> Underwood: For ??
> Gibson: U Know
> Underwood: You know I'm a lesbian
> Gibson: So am I lol. Gibson Test Messages dated around May 18, 2016, ECF No. 61-1, PageID.420.

> **May 24, 2017:** Underwood believes Gibson is requesting inappropriate pictures when he texts her, "Send them please I wanna se2 it all . . . you sending thrm [sic]. . . . Send me those pics now please." Gibson Text Messages dated May 24, 2017, ECF No. 61-1, PageID.415.

In May 2017, Underwood learned that PSCC was again closing its Blount County campus

for the summer when she unexpectedly noticed that she was not on the shift schedule, despite being

told that she would be working all summer and "had nothing to worry about." She showed up for work at Blount County, but a PSCC faculty member told her she was not needed. Confused, Underwood called site supervisor Gibson and he started calling her names, like "stupid" and "b*tch," and scolded her for showing up because she was "not supposed to be there."

Dynamic's procedure for reporting non-payroll issues directed employees to contact their respective district managers; for Underwood, that was Pamela Pauley. Underwood testified that she was never given Pauley's specific contact information; rather, she was directed to contact Dynamic's general office to discuss issues.

Underwood testified that she tried to contact Pauley several times earlier about Gibson's harassment but could not reach her. Underwood left four or five voice mail messages requesting that Pauley return her calls. Most of her calls were not returned. She did not connect directly with Pauley until sometime between February and May 2017. Underwood allegedly told Pauley that she "was having issues with [Gibson] sexually harassing [her]," to which Pauley responded, "We'll look into it." Underwood Dep., ECF No. 63-1, PageID.291. Pauley apparently did not investigate or ask for any details about the matter.

Underwood again spoke with Pauley over the phone in May 2017 to complain that Gibson was calling her names that day. Underwood testified that she did not believe that Gibson's name-calling, which stemmed from her reporting to the wrong location for work, constituted sexual harassment. But she told Pauley that the sexual harassment "was still going on," to which Pauley explained that Gibson "was going through a lot of issues at home." *Id.* at PageID.294.

Underwood also alleges that she called Sherry Spires, the human resources coordinator in Dynamic's Alabama headquarters, five or six times between May 25 and 26, 2017, to discuss Gibson's conduct because she "felt like the office . . . in Knoxville had not handled the issues."

*Id.* at PageID.288, 294-97. Per Dynamic's written policies, employees are supposed to contact the headquarters to report harassment claims. Underwood had difficulty reaching Spires because the phone number for Dynamic's headquarters that Underwood was provided with re-routed to Dynamic's "staffing division." Underwood left a voicemail message with Spires requesting that Spires return her call; she also asked someone in the office to request that Spires call her back. Spires never returned Underwood's calls; Underwood says that she was unable to speak to "anyone about anything" in Dynamic's human resources department. Spires maintains that she never received any complaints from anyone regarding J.T. Gibson. However, Spires acknowledged that she "received a voicemail from Ms. Underwood that stated that she needed to talk to [Spires] about a situation because her local branch was not handling it right." After contacting district manager Pauley, Spires says she thought that Underwood called about "a scheduling issue, and [that Underwood's local branch was] handling it."

After Underwood discovered that she was not supposed to work at Blount County over the summer, she called Pauley on May 18, 2017, to discuss the scheduling issue and Gibson's recent outburst, but Pauley did not answer. Pauley returned Underwood's call that day to tell her that Dynamic had other employment options for Underwood and requested that Underwood meet with her to discuss them. In early June 2017, Underwood met with Pauley, regional manager Conroy, and Scott Branch (Dynamic's management representative in Knoxville). Feeling uneasy about the meeting, Underwood recorded it on her phone without anyone's knowledge. A transcript of the recording is part of this record. Meeting Tr., ECF No. 61-1, PageID.423-455.

At the meeting, Underwood was offered one of four available positions for the summer of 2017 until the Blount County campus reopened. Unlike 2016, when Underwood transferred to the Hardin Valley campus for the summer, there were no available posts at PSCC.

Underwood declined the four opportunities, believing that none "would have been a fit" for her because she was not comfortable accepting an assignment where she would be assigned alone or partnered with a male officer overnight. Additionally, the positions entailed a much longer commute, extending her previous thirty-minute commute to over an hour. Underwood refused to sign a "Post Awareness/Acknowledgement" form at the meeting, memorializing the other posts available until her reassignment to Blount County. Regional manager Conroy then decided to terminate Underwood's employment effective June 7, 2017, allegedly for refusing to accept any of the assignments offered.

What was supposed to be a 15-minute meeting lasted an hour. During that meeting, Underwood testified, she was frightened by Conroy's demeanor: when she refused to sign the acknowledgment, he screamed at her while standing in the doorway and touched his holstered handgun a few times. Conroy and Branch also told Pauley that Underwood "called corporate a number of times." Pauley asked Underwood why she "was calling corporate." Underwood testified that she did not tell them about Gibson's alleged harassment at that time because she was afraid about losing her job at the meeting. She said her fear began to "escalate" as the meeting went on. She mentioned Gibson briefly during the meeting, focusing mostly on his May 2017 admonition about her showing up for work at Blount County. The exchanges went like this:

> Q (Conroy): And why would you go so far as to call corporate?
> A (Underwood): Because, first of all, last Tuesday J.T. [Gibson] did what he did. And the only question I have for [Gibson] was there was a staff member parked two spaces over [sic]. She (unclear who) comes out of the building with, hey, there's Pellissippi P.D. inside. So I thought, what clicked in my head was if Pellissippi P.D. is there, I don't need to be here. The only question I had for him is not regarding the post.
> Q: You called corporate before then.
> A: Yeah, because my pay was messed up back in February. I called several times, yes.
> Q: That's a [Pauley] issue, that's not a corporate issue. Once again, why did you call corporate?

A: That's it.  That's—you know, last Tuesday whatever he has going is, you know, he had no right doing what he did.
Q: And I talked to J.T. That was to be brought directly to me or Scott . . .
A: I have not sent anything to corporate.  I have not spoken to corporate at all.
Q: You called corporate on Thursday, May 25th [2017] and then turned around and called them back on May 26th.
A: Yeah, I've called them.  I have not spoken to anyone directly at all.  I have not spoken to anyone regarding anything.
Q: Okay. And you understand that all of the issues come to this office?
A: Yeah.
Q: And you have to give us the time to be able to investigate the issues and be able to respond to that issue.  You don't just—
A: I called here. I talked to you about it.
Q: Yeah. And then you turned around and you called corporate, what, five minutes later?

Meeting Tr., ECF No. 61-1, PageID.427-28.

Conroy accused Underwood of having an ulterior motive at the meeting, apparently believing that she "wanted to provoke a reaction for us to say something that could lead to litigation."  Conroy Dep., ECF No. 63-6, PageID.804.  Conroy never explained what exactly he thought Underwood was trying to bait him into saying, but he maintains that he was unaware of Gibson's alleged sexual harassment at the time.  And Pauley denies that the plaintiff ever told her about the harassment.  Conroy claims he "became agitated, not with the plaintiff," but "with the situation[] because[,] during the time that interview took place, [Dynamic] had a lot of business going on."  Conroy Dep., ECF No. 61-3, PageID.490.

The parties disagree about whether Dynamic maintains a policy of terminating employees who fail to accept a temporary position.  Section 17 of the Security Officer's Handbook includes language prescribing progressive discipline.  "Refusal to accept [a] reasonable assignment" may subject an employee to "probation," "suspension," or "termination."  *Id.* at PageID.397.

Conroy testified that there was no "specific length of time that a guard could not be assigned to a post and remain employed before Dynamic would terminate the employment;" rather,

this determination was conducted on a "case-by-case" basis. However, Pauley made clear that Underwood's refusal of a new assignment for the summer was not grounds for termination. Pauley testified:

> Q: So if a Dynamic guard—if a post is eliminated either temporarily or permanently, how long will Dynamic keep that employee on payroll . . . without them being assigned to a new post before letting them go?
> A: Just like we explained to [Underwood] before she left the office that day, because of it being a summer shutdown, we would have kept her on a fill-in status until her position opened up at Blount.
> Q: So she didn't have to take any of those positions that you were holding for her?
> A: No, but the option was there for her to.
> Q: So it was optional?
> A: Yes.
> Q: And she ultimately decided that she did not want to take one of those positions; correct?
> A: That's correct.
> . . . .
> Q: . . . [I]f I understood your testimony earlier, it was okay for [Underwood] to leave and not take those assignments and come back and work Pellissippi Blount when they reopened?
> A: When it reopened, yes.

Pauley Dep., ECF No. 63-5, PageID.758, 773-74. And Garrett testified that after her altercation with Underwood, Dynamic did not have a placement for her, so she "was out of work for about three months," but maintained her employment status with the company. Garrett Dep., ECF No. 63-2, PageID.662-64.

After filing a charge of discrimination with the Equal Employment Opportunity Commission, Underwood commenced this action against Dynamic and Ian Conroy, asserting federal and Tennessee claims for hostile work environment, retaliation, and false imprisonment. Underwood filed an amended complaint, to which Dynamic responded with a motion to dismiss the retaliation claim to the extent that it was based on her alleged complaint about Garrett, arguing that sexual harassment on the basis of sexual orientation does not constitute protected activity. Judge Thomas W. Phillips, previously assigned to this case, granted the defendant's motion as to

any part of Underwood's retaliation claim concerning her alleged complaint of harassment based on her sexual orientation. That order was entered before the Supreme Court decided *Bostock v. Clayton County, Georgia*, --- U.S. ---, 140 S. Ct. 1731 (2020) (holding that Title VII applies to claims of discrimination based on sexual orientation)). The Court left open the question of whether Underwood stated a claim for retaliation based on Gibson's conduct.

On April 12, 2019, the plaintiff filed a second amended complaint, which deleted the false imprisonment claim and eliminated Conroy as a defendant. That pleading asserted two claims against Dynamic Security, Inc.: hostile work environment under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401, *et seq.* (Count 1) and retaliation under Title VII and the Tennessee Human Rights Act (Count 2).

Dynamic filed the present motion for summary judgment. In response, the plaintiff withdrew her hostile work environment claim. The only remaining claim is based on retaliation for Underwood's complaints about the sexual harassment visited upon her by J.T. Gibson.

Dynamic also filed a motion to strike the plaintiff's jury trial demand. It contends that Underwood waived her right to a jury trial when she signed employment papers during the hiring process.

## II. Motion for Summary Judgment

In its motion, Dynamic attacks all aspects of Underwood's retaliation claim. It argues that Underwood did not engage in protected conduct that Dynamic knew about, it did not take adverse action against her, there is no causal link between any protected conduct, and it had a valid reason for firing her.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

Title VII prohibits an employer from retaliating against an employee who has opposed an "unlawful employment practice." 42 U.S.C. § 2000e–3(a). "When an employee's supervisor retaliates against the employee, the employer is vicariously liable for the supervisor's unlawful actions." *Mys v. Mich. Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998)). Tennessee courts interpret the Tennessee Human Rights Act "similarly, if not identically, to Title VII." *Ferguson v. Middle Tenn. St. Univ.*, 451 S.W.3d 375, 380 (Tenn. 2014); *Arendale v City of Memphis,* 519 F.3d 587, 606 (6th Cir. 2008) ("a retaliation claim under both statutes follows the same analysis").

A retaliation claim can be proved either by direct evidence of retaliation or by offering circumstantial evidence that permits an inference that an employer unlawfully retaliated illegally against an employee. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir. 2008)). Underwood relies entirely on her circumstantial case, thereby invoking "the burden-shifting framework" of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and later clarified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004). Under that framework, Underwood must first demonstrate a *prima facie* case. *Ibid.* If she succeeds, the burden of production of evidence shifts to Dynamic, who must articulate a legitimate, non-discriminatory reason for its actions. If the defendant satisfies its

burden of production, the burden shifts back to Underwood to demonstrate that Dynamic's proffered reason was not the true reason for the employment decision. *Ibid.* (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Ibid.*

### A. *Prima Facie* Case

The elements of a *prima facie* Title VII retaliation claim are that: (1) an employee engaged in activity protected by Title VII; (2) the employer had knowledge of the protected activity; (3) the employer took an adverse employment action against her; and (4) there is a causal link between the protected activity and the adverse employment action. *Id.* at 599-600 (6th Cir. 2018); *see also White v. Burlington N. & Santa Fe Ry. Co*., 364 F.3d 789, 796 (6th Cir. 2004), *aff'd* 548 U.S. 53 (2006) (citing *Jackson v. RKO Bottlers of Toledo, Inc*., 743 F.2d 370, 375 (6th Cir. 1984)).

### 1. Protected Activity

There is no question that Underwood engaged in protected activity when she complained at least twice in mid-2017 to district manager Pauley about site supervisor Gibson's sexual harassment. *Wasek v. Arrow Energy Servs., Inc*., 682 F.3d 463, 469 (6th Cir. 2012) ("[C]omplaining about allegedly unlawful conduct to company management is classic opposition activity."). Dynamic takes issue with Underwood's complaints to Spires, because Underwood never actually reached her. And it contends that Conroy, the actual decisionmaker here, was not aware of harassment reports by Underwood.

### 2. Defendant's Knowledge

An employment decision cannot be considered retaliation for protected activity if the decision-maker did not know about the alleged protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 552-553 (6th Cir. 2002); *Fenton v. HiSAN, Inc*., 174 F.3d 827, 832 (6th Cir. 1999). However,

direct evidence of knowledge by the decision-maker is not required; "a plaintiff may survive summary judgment by producing circumstantial evidence to establish this element." *Mulhall*, 287 F.3d at 552; *see Allen v. Mich. Dep't of Corr.,* 165 F.3d 405, 413 (6th Cir. 1999) (knowledge element satisfied by circumstantial evidence where plaintiff, an African American corrections officer, was the only African American officer returned to a post after complaining that all African American corrections officers were removed from that post); *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 531 (6th Cir. 1989) (knowledge element satisfied where, after plaintiff visited the Michigan Department of Civil Rights, her supervisor told her, "I know where you've been.").

"[K]nowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action." *Id.* at 553 (citing *Kralowec v. Prince George's Cnty., Maryland*, 503 F. Supp. 985, 1010 (D. Md.1980), *aff'd*, 679 F.2d 883 (4th Cir.), *cert. denied*, 459 U.S. 872 (1982)) (holding that the knowledge element was satisfied where plaintiff produced evidence that one county official knew of the plaintiff's complaint and that the "prior interaction" of that first official with the second official, who actually fired the plaintiff, made it "highly improbable . . . that [the first official] would not have discussed plaintiff's complaint with [the second official] as soon as [the first official] obtained this information.").

Conroy appears to have been the ultimate decisionmaker behind Underwood's termination. He testified that he was unaware of her harassment complaint. But after Underwood told Pauley — twice — about Gibson's harassing conduct, Pauley told her that Dynamic "would look into it." And after the second time, Pauley explained that Gibson "was going through a lot of issues at home." Then, at the last meeting, Conroy (according to Underwood) became agitated over Underwood's attempts to contact the corporate human resources office after Pauley failed to

- 13 -

address her complaints. Although Underwood never connected with Spires, the record reflects that Spires was aware of Underwood's calls and alerted both Conroy and Pauley about them. And although Spires may not have known exactly why Underwood was calling, the fact that Underwood called human resources provoked intense suspicion by Conroy. It is fair to conclude that Conroy's knowledge of Underwood's harassment complaints "can be inferred from evidence of the prior interaction" between Conroy and Pauley, where Pauley was allegedly aware of the harassment complaints and attended the meeting in which Conroy terminated Underwood. That evidence is sufficient to establish at the summary judgment stage of the case that Conroy knew about Underwood's complaints over Gibson's harassment of her.

### 3. Adverse Action

Dynamic next argues that it its termination of Underwood did not constitute a "materially adverse" employment action under Title VII or the Tennessee Human Rights Act because it offered her multiple job assignments, which she refused. In the retaliation context, a "materially adverse" employment action consists of any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Such an action "'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002)). "'A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Ibid.*

Dynamic bases its argument on *Hammon v. DHL Airways*, 165 F.3d 441, 447 (6th Cir. 1999), where the court held that an employee cannot claim to have suffered an adverse employment action if she voluntarily resigned. It also cites *Davis v. Kohler Co.,* No. 15-01305, 2017 WL 3611722, at *10 (E.D. Tenn., Aug. 22, 2017), for the proposition that "reassignments or lateral transfers without accompanying changes in salary, benefits, title, work hours, or material responsibilities do not constitute adverse employment actions." Neither case supports Dynamic's argument. Underwood did not voluntarily resign. Dynamic fired her. And Dynamic did not transfer Underwood to a different post with the same benefits, title, hours, or material responsibilities. Underwood did not accept a transfer. In fact, she was fired, purportedly, for not accepting one. That amounts to adverse action. Dynamic insists that the action was justified (more on that later), but it was adverse nonetheless.

### 4. Causation

To prove the causation element, Underwood must demonstrate "that the 'unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Mys*, 886 F.3d at 600 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Temporal proximity between that protected conduct and the adverse action generally is not enough, although it is "highly probative evidence of a causal connection." *Arendale*, 519 F.3d at 606 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). And "a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006). Courts have "always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400-01 (6th Cir. 2010).

Underwood has borne that burden here. After complaining to district manager Pauley about Gibson's sexual harassment at least twice (most recently in May 2017) and leaving voicemails intended for human resources director Spires on May 25 and 26, Dynamic fired her two weeks later on June 7, 2017. The record reflects that Spires contacted Pauley and Conroy to notify them about Underwood's attempts to call her about a situation that Underwood's "local branch was not handling [] right." Spires dep., ECF No.61-4, PageID.497. That apparently infuriated Conroy, who displayed his displeasure at the termination meeting when he screamed, blocked the entrance, touched his holstered gun, grilled Underwood about why she contacted human resources, and accused her of having an "underhand motive" for declining Dynamic's other posts. A reasonable factfinder could infer that Conroy terminated Underwood because she complained about Gibson's conduct and tried to report to Dynamic's human resources department the Knoxville office's failure to remedy the issue. *See Michael*, 496 F.3d at 596 (finding a causal connection between adverse actions alleged and the complaint filed with the defendant's human resources department based on (1) a two-day proximity between complaint and action, (2) the plaintiff received a positive evaluation and award, (3) the subject of the complaint suffered no disciplinary action, and (4) the defendant violated company policy by disciplining the plaintiff before providing written notice of complaints).

Underwood has offered evidence that establishes a *prima facie* case of retaliation.

### B. Defendant's Legitimate Basis for Firing Plaintiff

Dynamic maintains that its decision to terminate Underwood was entirely due to her refusal to accept a temporary position for the summer and had nothing to do with her complaints about Gibson's conduct. That amounts to a legitimate, non-discriminatory reason for its action against

Underwood.   It will undermine Underwood's circumstantial case, unless it is a pretext for retaliation.  *Laster*, 746 F.3d at 730.

C.  Pretext

"To meet [her] burden on pretext, [Underwood] must produce evidence sufficient that a finder of fact could reject [Dynamic's] proffered reason." *Michael*, 496 F.3d at 597.  Underwood "'can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Ibid.* (quoting *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000))).

Underwood has offered pretext evidence under the second and third options.  Although Conroy testified that refusing a temporary assignment was considered refusing to work, justifying termination, his testimony was contradicted by other evidence.  Dynamic's Security Officer's Handbook says that a "[r]efusal to accept [a] reasonable assignment" may subject an employee to "probation," "suspension," or "termination," Security Officer's Handbook, ECF No. 61-1, PageID.397, and the company professed to utilize a progressive discipline format.  Site supervisor Garrett testified that after her altercation with Underwood, Dynamic did not have a placement for her, so she "was out of work for about three months," but retained her employment with the company.  Although Garrett's situation is distinguishable from Underwood's because Dynamic did not have any temporary positions to offer Garrett, the testimony demonstrates Dynamic's willingness to maintain employer-employee relationships with individuals who cannot work for several months.  More to the point, district manager Pauley expressly and repeatedly testified that Underwood's decision to accept a temporary position was entirely "optional" and that Underwood could have "come back and work[ed at] Pellissippi Blount when [it] reopened."  Pauley Dep., ECF

No. 63-5, PageID.758, 773-74. All of that establishes fact questions over whether Underwood's refusal of a temporary reassignment actually motivated the defendant's decision to fire her and whether it was sufficient to warrant termination.

* * * * * * * *

The plaintiff has presented evidence that is sufficient to create fact issues on her retaliation claim that must be resolved at trial. The defendant's motion for summary judgment will be granted on the plaintiff's hostile work environment claim and denied in all other respects.

### III. Motion to Strike Jury Demand

The plaintiff filed a jury demand with her complaint. However, the defendant contends that she waived her right to a jury trial when she signed papers as a new employee.

On January 6, 2016, Underwood applied to work for Dynamic and received a copy of Dynamic's Standard Employee Packet and Employee Handbook, a two-page document that contains several policies applicable to Dynamic's employees. The Employee Packet included the following waiver of a trial by jury, which can be found on the packet's first page:

> In consideration of Dynamic Security, Inc. offering you employment and employing you, you and Dynamic Security each agree that in the event either party (or its successors or assigns) brings an action against the other relating to your recruitment, employment, or termination of employment from Dynamic Security Inc.[,] the plaintiff in such action agrees to waive his/her rights to a trial by jury and future [sic] agrees that no demand, request or motion will be made for trial by jury. This waiver of jury trial will cover (1) all actions, claims and demands directly or indirectly related to recruitment, employment or termination from Dynamic Security Inc. (2) All issues and causes of actions brought in any lawsuit in which an employment related claim is made; and (3) initial, subsequent and future proceeding related to (1) and (2) above.

> By waiving your right to a jury trial[,] you are not limiting your rights to trial by judge. However, the right to a jury is of value. You may wish to consult an attorney prior to signing this agreement. If so, take this form with you, however, you will not be offered employment until this form is signed and returned by you.

Standard Employee Packet, ECF No. 66-1, PageID.864-65.

Underwood signed the packet, indicating that she "acknowledge[s] receipt of the standard employee packet[, and] [u]nderstand[s] these Company Policies are binding and [] agree[s] to follow these policies to the best of [her] ability." *Id.* at pageID.865. Additionally, the "Policies" section of Dynamic's Security Officer's Handbook includes a nearly identical jury trial waiver. Security Officer's Handbook, ECF No. 61-1, PageID.403-04. She signed a separate "Acknowledgment and Receipt of Employee Handbook," indicating that she is "bound by, and will abide by, the rules, regulations, and policies set forth in this handbook." Acknowledgment and Receipt of Employee Handbook, ECF No. 66-1, PageID.863.

Dynamic has moved to strike the plaintiff's jury trial demand. Underwood opposes the motion, contending that the waiver was not knowingly or voluntarily made.

The Seventh Amendment protects a civil litigant's right to a jury trial in federal court, but waivers of that right by prospective employees have been found to be valid and enforceable. However, such a waiver is valid only if an employee does so knowingly and voluntarily. *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 420 (6th Cir. 2011) (citing *K.M.C. Co. v. Irving Trust Co*., 757 F.2d 752, 755–56 (6th Cir. 1985)). The Sixth Circuit applies "ordinary contract principles" and considers the following factors:

> (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Morrison v. Circuit City Stores, Inc*., 317 F.3d 646, 668 (6th Cir. 2003) (en banc).

Underwood contends that the waiver is unenforceable because it is part of an adhesion contract. "Under Tennessee law, an adhesion contract is 'a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot

obtain the desired product or service except by acquiescing to the form of the contract.'" *Walker v. Ryan's Fam. Steak Houses, Inc.*, 400 F.3d 370, 384 (6th Cir. 2005) (quoting *Buraczynski v. Eyring*, 919 S.W.2d 314, 322 (Tenn. 1996) (quoting Black's Law Dictionary 40 (6th ed.1990))); *see also C & L Enters. v. Citizen Band, Potawatomi Indian Tribe of Okla*homa, 532 U.S. 411, 423 (2001) (characterizing adhesion contract as one where a form agreement is "foisted" upon a "quiescent" party which did not prepare it). A critical component of an adhesion contract is "the absence of a meaningful choice for the party occupying the weaker bargaining position." *Cooper v. MRM Investment Co*., 367 F.3d 493, 501 (6th Cir. 2004).

In the employment context, Underwood must offer "evidence that [she] would be unable to find suitable employment if [she] refused to sign [Dynamic's] agreement." *Id.* at 502. She has not done that. Nor did she even make the argument that "she looked for comparable jobs but was unable to find one." *Ibid.* The jury trial waiver provision is not invalid as a contract of adhesion. *Ibid.* (finding no procedural unconscionability where employee failed to present evidence that she searched for alternative employment); *Walker*, 400 F.3d at 384-85 (same).

Moreover, all of the *Morrison* factors, save the first, favor upholding the waiver. *First*, Underwood graduated high school in 2001, and worked as a cashier and as an officer for other security companies. The defendant's characterization of her as a "sophisticated party" is not justified, but neither is she disadvantaged. *See Walker*, 400 F.3d at 381 (upholding district court's finding that the sophistication of the plaintiffs, many of which did not graduate high school, was "low-to-mid level"); *Tillman v. Macy's, Inc*., 735 F.3d 453, 461 (6th Cir. 2013) (rejecting the argument that plaintiff being a "high-school graduate means that she lacks the necessary 'experience, background, and education' to consent knowingly to a waiver of her rights"). This factor does not favor either party.

*Second*, Underwood never alleged that she was pressured into signing the agreement in any way. *Compare Walker*, 400 F.3d at 381-82 (finding provision purportedly affording applicants the right to consult an attorney before signing an arbitration agreement insufficient where plaintiffs "were hired on the spot after a brief interview, during which the hiring manager hurriedly presented them with various documents that they were instructed to sign" and sometimes would "place an 'x' in every spot an applicant is required to sign, and applicants would be told to sign every 'x' without any explanation" or "opportunity to take the Arbitration Agreement home."). The jury trial waiver expressly provides that applicants "may wish to consult an attorney prior to signing this agreement. If so, take this form with you, however, you will not be offered employment until this form is signed and returned by you." This factor favors the defendant.

*Third*, the language of the jury trial waivers in both documents is clear. The waiver is located on the first page of the two-page Standard Employee Packet. The font is the same size as the other language in the packet, it is written in plain English, and it presents as a separate paragraph in the packet. In the Handbook, the jury trial waiver policy is set out in a separate section with a boldfaced title. Underwood does not argue that the language is unclear or hidden. This factor favors the waiver's enforcement. *See Collins v. Countrywide Home Loans, Inc.,* 680 F. Supp. 2d 1287, 1294 (M.D. Fla. 2010) ("A provision is conspicuous when it is present in a separate paragraph, printed in a font that is the same size as the rest of the document, located in the last paragraph of a relatively short document, and worded in clear and unambiguous language").

*Fourth*, Underwood insists that there is no consideration whatsoever for the jury trial waiver because the company's application for employment included language disclaiming that the document created a "contract of employment" and an at-will relationship between employer and

prospective employee. She reasons, therefore, that there can be no contract-based jury trial waiver. However, that disclaimer appeared in the application, not the employee packet that each new employee signed after hiring. The mutuality of obligation arose when the company agreed to hire the applicant and the new employee accepted the conditions of employment.

"Under Tennessee contract law, '[m]utuality of promises is 'ample' consideration for a contract.'" *Seawright v. Am Gen. Fin. Servs., Inc.*, 507 F.3d 967, 974 (6th Cir. 2007) (quoting *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351 (Tenn. Ct. App. 2001) (quoting *Rodgers v. Southern Newspapers, Inc.*, 214 Tenn. 335, 379 S.W.2d 797, 800 (1964)). In *Seawright*, the Sixth Circuit held that, "[u]nder Tennessee law, continued employment can constitute acceptance" of an arbitration agreement or jury trial waiver. *Id.* at 973 (quoting *Fisher v. GE Med. Sys.*, 276 F.Supp.2d 891, 895 (M.D. Tenn. 2003) ("By continuing to work at GE, the plaintiffs accepted the terms of [the arbitration agreement], a binding contract."). It follows that by accepting a position with an employer, an employee accepts the proposed conditions of employment. Here, Dynamic agreed to employ Underwood at will on the condition that she promised to abide by its policies.

This factor favors enforcement of the jury trial waiver.

*Fifth*, considering these factors together, the total circumstances establish that Underwood knowingly and voluntarily waived her Seventh Amendment right to a jury trial on her employment-related claims against Dynamic.

## IV. Conclusion

The plaintiff has abandoned her claim for a hostile work environment. She has presented sufficient facts to overcome the defendant's motion for summary judgment on her remaining retaliation claim. However, she has waived her right to a jury trial on that claim.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 61) is **GRANTED IN PART AND DENIED IN PART**. The plaintiff's claim discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401, *et seq.* based on a hostile work environment is **DISMISSED WITH PREJUDICE**. The motion is **DENIED** in all other respects.

It is further **ORDERED** that the defendant's motion to strike the jury demand (ECF No. 66) is **GRANTED**. The case will proceed to trial before the Court sitting without a jury.

It is further **ORDERED** that the parties will appear via teleconference **on October 14, 2020 at 3:00 p.m.** for a status conference to establish a trial date and other case management deadlines.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Date: September 30, 2020